[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
 I. Statement of Case
This is an administrative appeal from a final decision of the State of Connecticut Department of Social Services (DSS), brought pursuant to General Statutes §§ 17b-61 and 4-183. The plaintiffs are Norma Lantiere and Lori Johndrow, executor of the estate of Joseph S. Lantiere.[1] The defendant is the Commissioner of DSS.
 II. Procedural History
The plaintiff Norma Lantiere, is a resident of Brittany Farms Health Center. She applied to DSS for Title XIX medical assistance for long term care on January 4, 1999. The application was denied due to excess assets on March 19, 1999. (Return of Record, ("ROR"), p. 7.) Thereafter, an administrative hearing was requested, and on May 14, 1999, an evidentiary hearing was conducted before a DSS fair hearing officer (FHO). The FHO issued a written decision dated June 23, 1999. The decision included both findings of fact and conclusions of law and affirmed the denial of Title XIX benefits.
Thereafter, an appeal was taken to the superior court. In an order dated January 31, 2000, the court (Satter, J.T.R.) remanded the case to DSS to permit the presentation of additional evidence to determine the value of the plaintiff's assets as of the date that the application for medicaid benefits was submitted.
An administrative hearing on remand was held on June 19, 2000. The FHO issued a second written decision dated August 11, 2000. In this decision, the FHO indicated that the evidence introduced by the parties at the May 14, 1999 hearing was incorporated into the August 11, 2000 decision. The second decision included findings of fact and conclusions of law. The FHO determined in relevant part that the plaintiff reduced her countable assets "below the $1,600 asset limit for the Medicaid CT Page 8422 program in the month of January, 1999. . . . However, I find the Appellant ineligible for medicaid benefits on the grounds that the December 29, 1998 transfer of $21,771.26 from her living trust was improper according to the regulations." (ROR, p. 101.)
The plaintiffs have commenced this second administrative appeal through their petition dated August 31, 2000. The appeal was initially filed in the superior court, judicial district of Hartford and was thereafter transferred to the judicial district of New Britain by order of the court.
 III. Jurisdiction
A. Aggrievement
General Statutes § 17b-61 (b) provides, in pertinent part: "[T]he applicant . . . if aggrieved, may appeal therefrom in accordance with § 4-183." General Statutes § 4-183 (a) provides in relevant part that "[a] person . . . who is aggrieved by a final decision may appeal to the Superior Court. . . ." "To be an aggrieved person, one must be affected directly or in relation to a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest such as is the concern of all members of the community, and the appellant must be specially and injuriously affected as to property or other legal rights." Smith v. Planning Zoning Board,203 Conn. 317, 321 (1987).
In the present matter the plaintiff was denied Title XIX benefits. In this appeal, DSS has not challenged aggrievement. This court finds that the plaintiff is aggrieved.
B. Timeliness of Appeal
General Statutes § 4-183 (c) provides, in relevant part: "Within forty-five days after mailing of the final decision under § 4-180
. . . a person appealing . . . shall serve a copy of the appeal on the agency that rendered the final decision . . . and file the appeal with the clerk of the superior court . . .
Through notice dated August 11, 2000, DSS transmitted the FHO's final decision. The plaintiffs filed this appeal in the Superior Court, judicial district of Hartford on September 12, 2000. It was thereafter transferred to the judicial district of New Britain. The defendant has not raised a jurisdictional defect. Thus, this court finds the appeal to be timely. CT Page 8423
 IV. Standard of Review
"Judicial review of [an administrative agency's] action is governed by the [Uniform Administrative Procedures Act (UAPA)] . . . and the scope of that review is very restricted. . . ." (Citations omitted; internal quotation marks omitted.) Cadlerock Properties v. Commissioner,253 Conn. 661, 668 (2000), U.S. cert. denied, 121 S.Ct. 1089 (2001). "The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." General Statutes § 4-183 (j).
Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . [T]he trial court may [not] retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. General Statutes § 4-183 (j)(5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . [S]ubstantial evidence . . . is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding CT Page 8424 from being supported by substantial evidence. . . .
(Citations omitted; internal quotation marks omitted.) CadlerockProperties v. Commissioner, supra, 253 Conn. 676-77.
The court must search the entire record to determine whether substantial evidence exists to support the agency's findings of fact, and whether the conclusions drawn from those facts are reasonable. Dolgnerv. Alander 237 Conn. 272, 283 (1996).
 Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts.
(Citations omitted; internal quotation marks omitted.) CadlerockProperties v. Commissioner, supra, 253 Conn. 669.
 V. Discussion
Plaintiffs' Claims of Error
The plaintiff and Johndrow have briefed numerous claims of error: (1) the legal owner of the proceeds of the sale of the property is Mr. Lantiere's testamentary trust; (2) the testamentary trust was not accessible to the plaintiff under medicaid rules; (3) the proceeds of the sale were not transferred out of the plaintiffs' trust to qualify her for medicaid; (4) it is improper to assume that legal representation by itself could prevent a scrivener's error; (5) the plaintiffs' retention of the $21,771.26 portion of the proceeds of the sale of the property constitutes the crime of larceny. (Plaintiffs' January 4, 2001 Brief; Plaintiffs' March 20, 2001 Reply Brief).
The FHO framed the issues to be addressed in the August 11, 2000 decision in the following manner: CT Page 8425
 A. The first issue to be decided is whether the Appellant is the legal and record owner of the funds in her Living Trust.
 B. The second [issue] to be decided is whether the funds in a Living Trust set up by the Appellant are accessible for purposes of determining Medicaid eligibility.
 C. The third issue to be decided is whether the Appellant has assets that exceed the Medicaid asset limit.
The FHO in the August 11, 2000 final decision stated the following in relevant part:
After reviewing all the evidence and testimony presented at the hearing, I have concluded that the assets of the Appellant's living trust were accessible and available to her until those assets were transferred out of her living trust. The trust consists of a checking account (#10/0015017707) held at Webster Bank. In accordance with UPM § 4030.80E(1), the Department considers the corpus of a revocable trust an available asset of the individual. Under the terms of the trust, the Appellant is the record and legal owner of any property or proceeds that were transferred into the trust. The fact that the trust is amendable and revocable establishes the Appellant's intent for the funds held in the trust to be used for the payment of her obligations. The Appellant's Living Trust directs the Trustee to provide as much of; if not all of, the principal and net income as necessary for the payment of any valid obligations of the Appellant. Therefore, I find those funds available to the Appellant for the purposes of determining eligibility for Medicaid benefits. The Appellant failed to establish by clear and convincing evidence that she is not the legal and record owner of the funds in her living trust that were derived from the sale of her interests in real property. Therefore, any transfer of those funds other than for the benefit of the Appellant must be considered an improper transfer of assets in order to qualify for Medicaid benefits. CT Page 8426
 However, four days prior to the date of her application for Medicaid coverage, the Appellant's trustee improperly transferred $21,771.26 from her revocable trust to her deceased spouse's estate which is subject [to] the terms of a testamentary trust. The $21,771.26 transferred from the Appellant's trust was not used for her benefit such as to pay for her cost of care or to pay an outstanding bill that she had incurred.
 The Appellant's trustee argued that there was a scrivener's error in the drafting of the quitclaim deed that resulted in the Appellant retaining 25% interest in the property rather than conveying all of her interest to her then living spouse. The Appellant was represented by counsel with regard to the drafting of the quitclaim deed. Therefore, one must assume that the quitclaim deed was reviewed by counsel and was well aware that the Appellant was retaining some interest in the property. Therefore, the record established that the Appellant is the record and legal owner of the $21,771.26, which she received from the sale of her interest in property formerly owned by her and her now deceased spouse.
 The Appellant reduced her countable assets to below the $1,600.00 asset limit for the Medicaid program in [the] month of January 1999, which is the month that her application for Medicaid was filed. However, I find the Appellant ineligible for Medicaid benefits on the grounds that the December 29, 1998 transfer of $21,771.26 from her living trust was improper according to the regulations. Therefore, the transfer of the assets referenced above subjects the Appellant's eligibility for Medicaid coverage to a penalty period pursuant to UPM 3028.05(C).
In support of these conclusions the FHO made nineteen findings of fact:
 1. Since April 11, 1997, the Appellant has been residing at Brittany Farms Health Center, which is a long-term care facility.
2. The Appellant's spouse died on April 27, 1997. CT Page 8427
 3. On April 3, 1997, the Appellant created a Living Trust, with two daughters as beneficiaries.
 4. On April 3, 1997, the Appellant made a quitclaim of one-half of her interest in property located at 319 Commonwealth Avenue, New Britain, CT to her then living spouse.
 5. The property was then sold on August 10, 1998, and the Appellant received twenty-five percent of the proceeds from the sale (25% of $87,085.03 = $21,771.26).
 6. The Appellant's Living Trust was funded in part with proceeds from the sale of her interest in the above real property.
 7. The principal in the Appellant's Living Trust consists of a checking account (#10/0015017707) at Webster Bank with a balance of $24,619.08 as of November 21, 1998.
 8. Under the terms of the Living Trust, the principal and net income shall be used for the health, support, maintenance, and general welfare of the Appellant.
 9. Under the terms of the Living Trust, the Appellant has the right to add or remove trust property, and to amend or revoke the terms of the trust
 10. Under the terms of the Living Trust, the trustee is able to distribute funds to the Appellant at her discretion.
 11. Under the terms of the Living Trust, the Appellant is the record and legal owner of any community property, income, and any proceeds derived from such property that were transferred into the Appellant's trust.
12. The principal that funds the Appellant's Living Trust is accessible to the Appellant. CT Page 8428
 13. On December 29, 1998, the trustee transferred $21,771.26 from the Appellant's Living Trust into the testamentary trust of her deceased spouse.
 14. The Appellant did not receive fair market value for the $21,771.26 that she transferred to her deceased spouse's testamentary trust.
 15. The Appellant's transfer of $21,771.26 to her deceased spouse's testamentary trust was done for the purpose of reducing her countable assets so that she could qualify for Medicaid coverage.
 16. On December 29, 1998, the trustee paid $3,085.42 in bills on behalf of the Appellant from the principal of her Living Trust.
17. The Appellant applied for Medicaid coverage on January 4, 1999.
 18. On January 22, 1999, the Appellant had a balance of $304.26 as the principal of her Living Trust in the month she applied for Medicaid coverage.
 19. On March 19, 1999, the Appellant's application for Medicaid coverage was denied due to excess assets.
(Citations to administrative record omitted).
Due to the complexity of the issues, a brief overview of the evidence contained within the record would be helpful in understanding the position of the parties. In April 1957, the plaintiff and her husband acquired a one-half undivided interest in real property located at 319 Commonwealth Avenue, New Britain, Connecticut.[2] (ROR, pp. 144-45). At the same time, John Paride and Mary Paride acquired the other one-half undivided interest in that property. (ROR, pp. 142-43). The result of this arrangement was that the two groups of persons were tenants-in-common, while the individuals within each group were joint tenants. In January of 1983, the Parides conveyed their one-half interest in the property to the plaintiff and her husband. (ROR, p. 147). At that point in time, the plaintiff and her husband owned the entire property as joint tenants. CT Page 8429
On April 3, 1997, the plaintiff created and executed "The NORMA P. LANTIERE Living Trust". (ROR, pp. 15-54). This was a revocable trust that was initially funded with ten dollars. (ROR, p. 19). In accordance with the terms of the trust, the plaintiff had "the express and total power to control and direct payments, add or remove trust property, and amend or revoke this trust." (ROR, p. 20). In the event that the plaintiff became disabled, the trustee was required to "apply the trust property, including its income, exclusively for [her] benefit and for [her] valid obligations . . . (ROR, p. 21).
On the same day that the trust was created (April 3, 1997), the plaintiff and her husband quitclaimed an undivided one-half interest in the property to the plaintiff's husband. (ROR, pp. 148-49). The quitclaim deed recited that the conveyance was not supported by consideration. (ROR, p. 148). The deed noted that "[r]eference may be had to a Warranty Deed from John Paride and Mary Paride to Joseph Lantiere and Norma Lantiere dated January 25, 1983 . . ." (ROR, p. 148), but it omitted reference to the original one-half interest acquired by the plaintiff and her husband in April 1957. (ROR, pp. 144-145). The result of the April 3, 1997 quitclaim deed was that the plaintiff retained an undivided one-half interest in her original undivided one-half interest in the property acquired in 1957. Immediately following the signing of the quitclaim deed, the plaintiff's husband then conveyed his interest in the property to "Lori L. Johndrow, as trustee of [the plaintiff's husband's] revocable trust." (ROR, p. 67-68).
During both the creation of the Living Trust and the April 3, 1997 quitclaim deed, the plaintiff was represented by legal counsel. At the time of the administrative hearing, the plaintiff presented evidence in an attempt to persuade the hearing officer that it was her intention on April 3, 1997 to convey all of her ownership interest in the property to her husband. (See e.g. ROR, pp. 55-68 and 215-220). The plaintiff maintained that the confusion arose through a scrivener's error. (ROR, pp. 55-68).
On or about April 11, 1997, the plaintiff became a resident of the Brittany Farms Health Center, a skilled nursing intermediate care facility located in New Britain, Connecticut. (ROR, 179-188). On April 27, 1997, the plaintiff's husband, Joseph Lantiere, died. (ROR, p. 220). At the time of his death, a testamentary trust was created, and his interest in the property became an asset of that testamentary trust. (ROR, p. 221). The plaintiff is the sole beneficiary of the income derived from the testamentary trust during her lifetime. (ROR, pp. 68, 215, and 220).
On May 30, 1998, the Lantiere testamentary irust entered into a CT Page 8430 contract for the sale of the property. (ROR, pp. 131-135). "The property was then sold on August 10, 1998, and the Appellant received twenty-five percent of the proceeds from the sale (25% of $87,085.03 = $21,771.26)." (Final Decision, Finding of Fact number 5). From the date of the plaintiff's husband's death until the time it was sold, the home on the property remained vacant, but the plaintiff considered it her residence. (ROR, p. 237-239). The property was conveyed in two deeds, one from the Lantiere testamentary trust, and the other from the plaintiff. Johndrow executed both deeds as trustee of the trust and power of attorney for the plaintiff. (ROR, p. 228). The $21,771.26 received by the plaintiff from the sale was then deposited into a Webster Bank interest bearing checking account held by the plaintiff's Living Trust. (ROR, p. 8). These funds remained in that account "until the end of December [1998] when I [Johndrow] transferred it out in order to apply for Title 19." (ROR, p. 254). The transferred funds were deposited in the plaintiff's husband's testamentary trust. (Final Decision, Finding of Fact 15). The plaintiff applied for medicaid medical assistance on January 4, 1999. (ROR, p. 12). The plaintiff's application was denied on March 19, 1999 due to excess assets. (ROR, p. 12-13; Final Decision Finding of Fact 19).
In Ross v. Giardi 237 Conn. 550 (1996), our Supreme Court reviewed the history of the Medicaid program. The court stated in part: "The medicaid program, established in 1965 as Title XIX of the Social Security Act, and codified at 42 U.S.C. § 1396 et seq., provid[es] federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons. 42 U.S.C. § 1396 et seq. Although states participate voluntarily, a state electing to participate must develop a plan, approved by the secretary of health and human services, containing reasonable standards . . . for determining eligibility for and the extent of medical assistance. . . . 42 U.S.C. § 1396a (a) (17). Connecticut has elected to participate in the medicaid program and has assigned to the department the task of administering the program. General Statutes § 17-134a et seq." (Citations omitted; internal quotation marks omitted). Ross v. Giardi, supra, 237 Conn. 555-56. See also Ahem v.Thomas, 248 Conn. 708, 713 et seq. (1999).
DSS administers the Connecticut medicaid system. General Statute §17b-260. General Statutes § 17b-261 addresses medical eligibility: "Medical assistance shall be provided for any otherwise eligible person . . . and if such person is an institutionalized person . . . and has not made an assignment or transfer or other disposition of property for less than fair market value for the purpose of establishing eligibility for benefits or assistance under this section." Pursuant to General Statutes § 17b-10 (c), DSS, in carrying out its regulatory authority, has promulgated a Uniform Policy Manual (UPM). UPM § 4005.10(A)(2)(a) establishes a $1,600 non-excludable asset limit to qualify as a medically CT Page 8431 needy individual. UPM § 0500 defines "revocable trust" as "a trust which the settlor reserves the right to dissolve when he or she desires." UPM § 3028.11(B)(2) establishes that "[t]he Department considers payments from a revocable trust other than those made to or for the benefit of the individual to be assets transferred by the individual. . . ." In addition, UPM §§ 4030.80(E)(1) and (2) state that "[t]he Department considers the corpus of a revocable trust as an available asset of the individual . . . [and] payments from a revocable trust to or for the benefit of the individual to be the individual's income." In order to transfer assets without penalty, the burden is on the "institutionalized individual" to demonstrate by "clear and convincing evidence that the transfer was made exclusively for a purpose other than qualifying for assistance" or "that he or she intended to dispose of the asset at fair market value." UPM §§ 3028.10(E) and (F). Further, the burden to demonstrate by clear and convincing evidence the appropriateness of a transfer from a revocable trust is subject to a 60 month look-back period. UPM § 3028.05(C)(3). Finally, if the medicaid applicant "is the record owner of an asset, the [applicant] is considered the legal owner unless it establishes otherwise, with clear and convincing evidence." UPM § 4010.05(A)(1). A "record owner" is defined as "the person who has apparent ownership interest as shown on a title, registration, or other documentation." UPM § 0500.
The gravamen of the plaintiff's claims of error is that, although the plaintiff was the record owner on August 10, 1998 of her interest in the property, she was not the legal owner, and did not, therefore, own the proceeds of the sale. The plaintiff contends that her husband was the legal owner as a result of the April 3, 1997 quitclaim deed because, notwithstanding the alleged scrivener's error, it was her intention to convey all of her interest in the property to her husband. Thus, the plaintiff maintains that "a constructive trust was created in Ms. Lantiere holding the proceeds of sale in trust for Mr. Lantiere." (Plaintiff's Brief, p. 5). The plaintiff asserts that the defendant "never addressed the constructive trust argument, and instead determined that simply because the proceeds from the sale were in Ms. Lantiere's inter vivos trust account, she controlled the money and it belongs to her. . . . This conclusion is a clear error of law, clearly erroneous based upon the undisputed facts, and is an arbitrary and capricious abuse of discretion since it fails to make the ab initio determination of the legal owner of the asset at issue." (Plaintiff's Brief, p. 5)[3]
The court is not persuaded by the plaintiff's position in light of the applicable regulatory requirements and the evidence in the administrative record. Further, the court is aided by public policy considerations behind the medicaid qualification rules, namely, ". . . [t]he legislative CT Page 8432 concern that the medicaid program not be used as an estate planning tool. The medicaid program would be at fiscal risk if individuals were permitted to preserve assets for their heirs while receiving medicaid benefits from the state." Forsyth v. Rowe, 226 Conn. 818, 828 (1993); see also, Bezzini v. Department of Social Services, 49 Conn. App. 432, 441
(1998).
During the years of April, 1957 to August, 1998, the plaintiff was a record owner of various portions of real property known as 319 Commonwealth Avenue in New Britain, Connecticut, the family home. In April, 1997, the plaintiff became a resident of a health care facility, but she desired to return to her home. It is reasonable to construe the plaintiff's desire to return home as an indication of her belief that the property was still hers.
On August 10, 1998, when the property was sold to a third party, the plaintiff was the record owner of an undivided one-half interest in the portion of the property acquired in 1957. In recognition of her ownership interest, she received twenty-five percent of the sales price ($21,771.26). These funds were deposited in the plaintiff's revocable trust checking account over which she exercised absolute control. The monies remained in the checking account until the end of December, 1998 when they were transferred to her late husband's testamentary trust, of which the plaintiff was the beneficiary and from which she received the benefit of income. It is reasonable to conclude that the income from the testamentary trust would include the income generated by the investment of the $21,771.26 in question. Further, Johndrow acknowledged that the transfer was made in order to apply for medicaid medical assistance in direct contravention of UPM § 3028.10(E) which mandates that the transfer of an asset be "made exclusively for a purpose other than qualifying for assistance". The plaintiff applied for medicaid benefits on January 4, 1999, one week after the transfer, further supporting the conclusion that the transfer was made in order to apply for benefits.
The assets of a revocable trust are considered "an available asset of the individual." UPM § 4030.08(E)(1). The record owner of an asset "is considered the legal owner unless the [individual] establishes otherwise, with clear and convincing evidence." UPM § 4010.05 (A)(1).
The burden is on the "institutionalized individual" to provide "clear and convincing evidence" that the transfer of an asset "was made exclusively for a purpose other than qualifying for assistance" or they "intended to dispose of the asset at fair market value." UPM § 3028.10(E)(F). A transfer from a revocable trust is subject to a sixty month look back period. UPM § 3028.05(C)(3). CT Page 8433
The FHO concluded that the plaintiff "failed to establish by clear and convincing evidence that she was not the legal and record owner of the funds in her living trust that were derived from the sale of her interests in real property." (Final Decision, ROR, p. Additionally, the FHO found that transfer of the funds to the descendant husband's testamentary trust was made without the receipt of fair market value and within days of her medicaid application. (Final Decision, ROR pp. 100-101.) The FHO evaluated the plaintiff's argument that her intention was to convey all her interest in the property on April 3, 1999, but was prevented from doing so by scrivener's error. The FHO did not find this position to be credible. (Final Decision, ROR, p. 101).
The role of the trial court in this appeal is not to retry the case or substitute its own judgment for that of DSS. Rather, the court must sustain the agency's factual determinations and affirm its decision if there is substantial evidence in the record taken as a whole to support it. Salmon v. Department of Public Health and Addiction Services,58 Conn. App. 642, 660-661 (2000), cert. granted on other grounds254 Conn. 926 (2000).
The court finds that the record contains substantial evidence which the FHO chose to credit to support its findings. "The question is not whether the trial court would have reached the same conclusion but whether the record . . . supports the action taken." Hospital of St. Raphael v.Commission on Hospitals and Health Care 182 Conn. 314, 318 (1980). Finally, the court finds that the FHO correctly applied the law to the facts. "Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." O'Callaghan v. Commissioner of SocialServices, 53 Conn. App. 191, 203 (1999).
Accordingly, the August 11, 2000 decision is affirmed and the appeal is dismissed.
 VI. Conclusion
For all the foregoing reasons set forth herein, the appeal from the FHO's August 11, 2000 final decision is ordered dismissed.
BY THE COURT:
Peter Emmett Wiese, Judge